No. 2-21-0763
Opinion filed December 29, 2021

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| MICHAEL ABBINANTI, as Health Care Agent for Sebastian Abbinanti, and LUISA FASO, as Health Care Agent for Maria Abbinanti, | ) ) ) ) | Appeal from the Circuit Court of Kane County. |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| v. | ) | No. 21-MR-2143 |
| | ) | |
| PRESENCE CENTRAL AND SUBURBAN HOSPITALS NETWORK, d/b/a Amita Health Saint Joseph Hospital Elgin, | ) ) ) ) | Honorable Robert J. Villa, |
| Defendant-Appellee. | ) | Judge, Presiding. |

_____

JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Justices Jorgensen and Birkett concurred in the judgment and opinion.

**OPINION**

¶ 1     The facts underlying this case are sad indeed. Sebastian and Maria Abbinanti, the 40-year-old parents of three children, were admitted to the intensive care unit (ICU) of Amita Health Saint Joseph Hospital Elgin (Saint Joseph or hospital) with COVID-19 in late November 2021. Despite receiving every treatment permitted under the hospital's protocols, they remained critically ill.[1]

_____

[1] Just how ill the Abbinantis were was confirmed in the saddest possible way when, during

On December 15, 2021, their representatives—the plaintiffs, Michael Abbinanti, as health care agent for Sebastian Abbinanti, and Luisa Faso, as health care agent for Maria Abbinanti— filed an emergency motion in the circuit court, seeking an immediate mandatory injunction (a temporary restraining order or TRO) requiring the hospital to administer the medication ivermectin to them. The parties filed briefs and supporting materials, and after a lengthy hearing on December 17, the trial court denied the request for a TRO. The plaintiffs filed this expedited appeal. We affirm.

¶ 2                                 I. BACKGROUND

¶ 3      Ivermectin is approved for internal use in humans (and animals, albeit at different dosages) to treat intestinal infections caused by some parasitic worms. It is also approved in a topical form to treat head lice and certain skin conditions such as rosacea. Although some physicians have recommended the use of ivermectin to treat COVID-19, the Food and Drug Administration (FDA) has not approved such use, stating that "[c]urrently available data do not show ivermectin is effective against COVID-19." See *Why You Should Not Use Ivermectin to Treat or Prevent COVID-19*, U.S. Food & Drug Admin. (Dec. 12, 2021), https;//www.fda.gov/consumers/consumer -updates/why-you-should-not-use-ivermectin-treat-or-prevent-covid-19 [https://perma.cc/VZM6-DB49]. The American Medical Association (AMA), American Pharmacists Association (APA), and American Society of Health-Systems Pharmacists (ASHSP) have issued a joint statement that they "strongly oppose the ordering, prescribing, or dispensing of ivermectin to prevent or treat COVID-19 outside of a clinical trial." See *AMA, APhA, ASHP Statement on Ending Use of*

_____

the brief pendency of this appeal, Maria Abbinanti passed away. Although the appeal is now moot as to her, the issues raised on her behalf apply equally to her husband and are addressed by us herein.

*Ivermectin to Treat COVID-19*, Am. Med. Ass'n (Sept. 1, 2021) https://www.ama-assn.org/press-center/press-releases/ama-apha-ashp-statement-ending-use-ivermectin-treat-covid-19 [https://perma.cc/S4C6-3NZH]. The defendant, Presence Central and Suburban Hospitals Network, owns and operates Saint Joseph. Aware of the rising public demand for ivermectin as a treatment for COVID-19 as well as the cautions against such use by medical and governmental bodies, the defendant undertook its own consideration of the issue. In September 2021, the defendant adopted a policy prohibiting the administration of ivermectin to treat COVID-19 at its hospitals, including at Saint Joseph.

¶ 4   Dr. Sergei Lipov is a doctor of internal medicine. In an unattested declaration submitted with the plaintiffs' complaint for declaratory and injunctive relief, Dr. Lipov stated that he was "on staff" at the hospital and that he had been the attending physician for the Abbinantis during their stay at Saint Joseph's ICU.   After all of the available protocols to treat the Abbinantis' COVID-19 had been implemented without any improvement in their conditions, he asked to administer ivermectin to them, as requested by their representatives. Dr. Lipov stated that he had reviewed medical literature promoting such use and had weighed the possibility of adverse impact on the Abbinantis from ivermectin. Without stating that he believed that ivermectin would be effective to treat the Abbinantis' COVID-19, he noted that their families were "desperate to help them as much as possible" and said that he did "not see any harm in trying this drug even if only to reassure family members that 'everything possible' was done to save" the Abbinantis. Because of the defendant's policy against such use of ivermectin, however, Dr. Lipov was unable to write or fill a prescription for ivermectin or administer it to the Abbinantis in Saint Joseph's ICU. The plaintiffs then brought suit on behalf of the Abbinantis.

¶ 5 During the rapid briefing of the TRO motion, both sides presented materials regarding the possible efficacy of ivermectin to treat or prevent COVID-19. The plaintiffs relied upon articles and an unattested declaration by Pierre Kory, M.D., who identified himself as an expert on the management of COVID-19 and in particular on the use of ivermectin to treat or prevent it. The defendant presented reports critiquing the studies relied upon by Dr. Kory as small and not well-designed, noting that no adequately sized and well-designed studies had observed any effect from ivermectin, and noting an increase in adverse reactions and calls to poison-control centers associated with the use of ivermectin.

¶ 6 The trial court reviewed all of the materials presented and heard argument from both sides. It commented that, although Dr. Kory and the other physicians who supported the use of ivermectin might be characterized as a "fringe" group, the court itself generally believed that new and alternative medical approaches could be valid and that patients' desires to avail themselves of such approaches should be respected. However, the question before it was not whether treatment with ivermectin was a good idea or a bad one, but whether the plaintiffs had made a valid legal case that the court should override the hospital's judgment about ivermectin. Thus, it was required to focus on whether the plaintiffs had shown the requirements for a TRO: a protectible right, irreparable harm, an inadequate remedy at law, and a likelihood of success on the merits.

¶ 7 Turning to those elements, the trial court found that the plaintiffs had not shown that the Abbinantis had a legal right to be administered medication that was against the standard of care developed by the hospital. The plaintiffs had argued that, as patients, the Abbinantis (and by extension their representatives) had an express contract with the hospital pursuant to the hospital's written statement of "patient rights and responsibilities." That document noted patients' rights to, among other things, have "reasonable access to care," be allowed to "participate in decision-

making processes related to their plan of care," be informed about "alternative methods of treatment," and give informed consent. The trial court found that, to the extent that the document could be considered a contract, it did not give patients the right to receive whatever medical treatment they wanted if that treatment was against hospital policy. Similarly, although the plaintiffs had referred generally to an implied contract between the Abbinantis and the hospital, they offered no details as to the terms of that implied contract or how the hospital's prohibitions on the use of ivermectin to treat COVID-19 violated that contract.

¶ 8 Instead, at oral argument the plaintiffs relied almost entirely on section 10.8(a)(3) of the Hospital Licensing Act (Act) (210 ILCS 85/10.8(a)(3) (West 2020)), which provides in pertinent part that, when a physician is "employed" by a hospital as defined in that statute, the hospital and physician must acknowledge in writing that the hospital may not "unreasonably exercise control, direct, or interfere with the employed physician's exercise and execution of his or her professional judgment in a manner that adversely affects the employed physician's ability to provide quality care to patients." The plaintiffs argued that the defendant was unreasonably interfering with Dr. Lipov's recommended care of the Abbinantis, in violation of the Act. The defendant argued that the Act did not give doctors the right to treat their patients in ways that disregarded hospital policies.

¶ 9 The trial court rejected the plaintiffs' argument that the Abbinantis had a legal right to receive ivermectin under the Act. As an initial matter, the court found that the Act only governed the relationship between hospitals and the physicians they employ; it did not grant patients such as the Abbinantis legal rights that could be enforced by a court. Dr. Lipov, the physician whose rights were arguably violated by the hospital's ivermectin policy, could conceivably have brought

suit under the Act. [2] But he was not a party to the lawsuit, and his rights could not be asserted by the plaintiffs.

¶ 10    Second, the trial court found that, for the Abbinantis to have a protectible legal right arising under the Act, the plaintiffs would have to show that it was unreasonable for the hospital to require its physician-employees to abide by its established policies. However, there was conflicting evidence regarding the potential efficacy of ivermectin to treat COVID-19. The hospital weighed that evidence before adopting its policy, and that policy was supported by the FDA, the AMA, the APA, and the ASHSP. Thus, even if the Abbinantis could have legal rights under the Act and even if the hospital's policy interfered with Dr. Lipov's recommended treatment of them, the plaintiffs had not shown that the hospital's policy was unreasonable, as required under the Act.

¶ 11    The trial court concluded that that the plaintiffs had failed to show that the Abbinantis had a right, either under the Act or on any other legal basis, to force the hospital to allow Dr. Lipov to administer ivermectin against hospital policy. Further, the plaintiffs had not shown that they were likely to succeed on the merits once the case was heard in full. Finally, the trial court noted that a TRO should be issued only to preserve the status quo while the parties pursued a preliminary injunction. The trial court found that the status quo before the litigation was that Dr. Lipov was able to exercise his medical judgment as to patients in the hospital only within the bounds of hospital policy. Thus, granting the injunction requested by the plaintiffs would overturn the status quo, not preserve it. For all of these reasons, the trial court denied the plaintiffs' request for immediate declaratory and injunctive relief. This expedited appeal followed.

---

[2] It is not clear from the record whether Dr. Lipov was "employed" by the hospital under the narrow definition in the Act such that the Act applied to him.

¶ 12                                    II. ANALYSIS

¶ 13    This court is highly sympathetic to the plaintiffs' worthy goal, which is to pursue every possible avenue that could benefit the Abbinantis' health. However, as an appeals court in a sister state has observed, "judges are not doctors" and "cannot practice medicine from the bench." *Texas Health Huguley, Inc. v. Jones*, No. 02-21-00364-CV, 2021 WL 5405794, at *1 (Tex. App. Nov. 18, 2021). "The judiciary is called upon to serve in black robes, not white coats. And it must be vigilant to stay in its lane and remember its role. Even if we disagree with a hospital's decision, we cannot interfere with its lawful exercise of discretion without a valid legal basis." *Id.* at *7. Mindful of our limited role, we must focus on the legal question of whether the plaintiffs have met the legal standards for the emergency injunction they seek.

¶ 14    A TRO is a drastic remedy that should only be granted in exceptional circumstances and for a brief duration. *Capstone Financial Advisors, Inc. v. Plywaczynski*, 2015 IL App (2d) 150957, ¶ 10. The purpose of a TRO is to allow the trial court to preserve the status quo until it can hold a hearing to determine whether it should grant a preliminary injunction. *Delgado v. Board of Election Commissioners of the City of Chicago*, 224 Ill. 2d 481, 483 (2007).

¶ 15    The party seeking the TRO or preliminary injunction must demonstrate that there is a "fair question" as to each of the following: (1) a clear right in need of protection, (2) irreparable injury in the absence of an injunction, (3) no adequate remedy at law, and (4) a likelihood of success on the merits of the case. *Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill. 2d 52, 62 (2006); *Fox Fire Tavern, LLC v. Pritzker*, 2020 IL App (2d) 200623, ¶ 22. The failure to establish any one of these elements is a sufficient basis to deny a request for a TRO. *Yellow Cab Co. v. Production Workers Union of Chicago & Vicinity, Local 707*, 92 Ill. App. 3d 355, 356 (1980). The grant or denial of injunctive relief such as a TRO is a matter within the trial court's discretion and is generally

reviewed only for an abuse of that discretion. *Mohanty*, 225 Ill. 2d at 62-63. However, to the extent that the trial court's decision rests on a purely legal issue such as the interpretation of a statute or contract, we review that interpretation *de novo*. *Id.* at 63.

¶ 16    Here, the trial court found that neither section 10.8 of the Act nor the defendant's statement of patient rights and responsibilities gave rise to an enforceable legal right to receive medical care that contravened the defendant's policies. On appeal, the plaintiffs do not raise any argument that the trial court incorrectly interpreted the Act when it held that the Act governs only the relationship between hospitals and the doctors they employ and does not give patients themselves any right to sue. Instead, the plaintiffs simply assert that the Act applies to the Abbinantis, and further, that the proper remedy for a violation of the Act is to override a hospital's policies, even if those policies were adopted after careful consideration of medical evidence.

¶ 17    The plaintiffs do not support this bare argument with any citation to relevant authority. If a party does not offer any argument or meaningful authority in support of an argument, the argument is forfeited. Ill. S. Ct. R. 341(h)(7) (eff. Jan. 1, 2016); *People ex rel. Illinois Department of Labor v. E.R.H. Enterprises, Inc.*, 2013 IL 115106, ¶ 56. Here, the plaintiffs—as the ones seeking an emergency injunction—had the burden of showing at least a fair question that they had a legal right in need of protection. *Mohanty*, 225 Ill. 2d at 62. By failing to support their assertion that the Act gives them any legal rights, they have failed to carry this burden.

¶ 18    The plaintiffs also briefly assert that the statement of patient rights and responsibilities is an express written contract between the hospital and the Abbinantis, and that there is also an implied contract between them. Again, however, the plaintiffs fail to provide any legal authority (1) establishing the existence, nature, or terms of the implied contract they assert, or (2) supporting their claim that the statement of patient rights and responsibilities should be considered an express

contract, let alone one that gives the Abbinantis the right to receive whatever medical care they or their doctor wish. Thus, those arguments are also forfeited. *E.R.H. Enterprises, Inc.*, 2013 IL 115106, ¶ 56.

¶ 19    Even if we were to undertake our own analysis of the statement of patient rights, we would have to agree with the trial court that nothing in it creates the right to receive medical treatment that contravenes hospital policy. *Gallagher v. Lenart,* 226 Ill. 2d 208, 233 (2007) (in interpreting a contract, courts must look to its the plain meaning of its language). Even the asserted rights to be informed about "alternative methods of treatment" and about whether a particular treatment is "experimental in nature" do not support the plaintiffs' argument—a promise to inform patients about different treatment options is not the same as a promise that the hospital will make all of those options available to patients.

¶ 20    The plaintiffs have not shown the first requirement for an injunction—that they have a legal right in need of protection—and thus the trial court did not err in denying their request for one. *Yellow Cab Co.*, 92 Ill. App. 3d at 356. In addition, they have not shown a likelihood of success on the merits. Every published appellate decision involving a request by a patient to force a hospital or doctor to administer ivermectin to treat COVID-19 has rejected that request. See *Huguley*, 2021 WL 5405794, at *15; *DeMarco v. Christiana Care Health Services, Inc.*, No. 2021-0804-MTZ, 2021 WL 4343661, at *13 (Del. Ch. Sept. 24, 2021).

¶ 21    Lastly, we also agree with the trial court that the essential purpose of a TRO—to maintain the status quo until a more complete hearing can be held—would not be advanced by granting the plaintiffs the relief they seek here. The plaintiffs argue that that the "status quo" should be viewed as the period before Dr. Lipov asked to treat the Abbinantis with ivermectin, when (they argue) he was able to treat the Abbinantis "according to his own professional judgment and without

interference from hospital administrators." However, the plaintiffs have not established that Dr. Lipov was *ever* able to exercise unfettered judgment about the medical care the Abbinantis would receive in Saint Joseph. The record reflects that Dr. Lipov was always required to follow the hospital's guidelines and standards of care. His request to administer ivermectin to the Abbinantis simply made the control exercised by the hospital visible. Moreover, that control is sanctioned by Illinois law, which places on hospitals an independent responsibility for the care of patients and a corresponding duty to supervise the treatment that physicians provide to their patients within the hospital. See *Darling v. Charleston Community Memorial Hospital*, 33 Ill. 2d 326, 332 (1965) (adopting the doctrine of institutional negligence); see also *Jones v. Chicago HMO Ltd. of Illinois*, 191 Ill. 2d 278, 291-92 (2000). Thus, even under the plaintiffs' characterization of the "status quo," Dr. Lipov could not treat the Abbinantis with medication forbidden by hospital policy. As the plaintiffs seek to change that status quo, not maintain it, their request is contrary to the essential purpose of emergency injunctive relief. *Delgado*, 224 Ill. 2d at 483.

¶ 22    The plaintiffs' last complaint on appeal is that the trial court weighed the evidence and made credibility determinations. Again, however, they cite no authority supporting their contention that these acts were improper when considering whether to issue a TRO. Thus, this argument is forfeited. *E.R.H. Enterprises, Inc.*, 2013 IL 115106, ¶ 56. Even if it were not forfeited, the argument lacks force. The entry of a TRO requires a showing of the likelihood of success on the merits, and assessing whether this requirement has been met may involve weighing evidence and making credibility determinations. See *County of Du Page v. Gavrilos*, 359 Ill. App. 3d 629, 636 (2005).

¶ 23    We take no joy in affirming the trial court's decision here, as we understand the desperation driving the plaintiffs' quest to explore all avenues for the Abbinantis. But as judges, we must

follow the law, and we cannot discern a legal basis on which to grant the plaintiffs the remedy they seek.

"Patients, even gravely ill ones, do not have a right to a particular treatment \*\*\*. This court will wield its equitable powers only to enforce a right or duty; in their absence, relief is not available. The patient has this [c]ourt's sincerest sympathies and best wishes, but not an injunction." *DeMarco*, 2021 WL 4343661, at \*1.

¶ 24                                  III. CONCLUSION

¶ 25     For the reasons stated, the judgment of the circuit court of Kane County is affirmed.

¶ 26     Affirmed.