NOTICE
Decision filed 03/03/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 260145-U

NO. 5-26-0145

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| 360 HEALTH MSO, LLC, f/k/a Prospero Master Management Holdings LLC, | ) ) ) | Appeal from the Circuit Court of Madison County. |
| Plaintiff and Counterclaim Defendant-Appellant, | ) ) | |
| v. | ) ) | No. 26-CH-7 |
| THOMAS J. HOPKINS, | ) ) | |
| Defendant and Counterclaim Plaintiff-Appellee | ) ) ) | |
| (Frank Grasso and Sam White Jr., Third-Party Defendants-Appellants). | ) ) ) ) | Honorable Ronald J. Foster Jr., Judge, presiding. |

JUSTICE HACKETT delivered the judgment of the court.
Justices Boie and Sholar concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court did not abuse its discretion in granting the defendant-counterclaim plaintiff's motion for temporary restraining order compelling the plaintiff-counterclaim defendant and third-party defendants to reinstate the defendant-counterclaim plaintiff as a manager and medical director of 360 Health MSO, LLC, and as medical director of its associated anesthesia practices.

¶ 2    The plaintiff and counterclaim defendant, 360 Health MSO, LLC (360 MSO), f/k/a Prospero Master Management Holdings LLC, and third-party defendants, Frank Grasso and Sam White Jr., appeal, pursuant to Illinois Supreme Court Rule 307(d) (eff. Nov. 1, 2017), the February 19, 2026, oral ruling of the circuit court of Madison County, granting the motion for temporary

1

restraining order (TRO) filed by the defendant and counterclaim plaintiff, Dr. Thomas J. Hopkins. Dr. Hopkins sought the TRO after he was removed as a manager and medical director of 360 MSO due to allegations that he had breached his fiduciaries duties and violated various managerial and medical director agreements. For the following reasons, we affirm.

¶ 3                                I. BACKGROUND

¶ 4      360 MSO was formed and managed by three individuals, Dr. Hopkins (40% member interest), Grasso (30% member interest), and White (30% member interest). 360 MSO was a healthcare management service that had the exclusive contractual rights to provide non-clinical support for two anesthesia practices—360 Anesthesia, LLC, and G&G Anesthesia, LLC (the PLLCs). The non-clinical support provided by 360 MSO included the retention of a medical director and other operational leadership for the PLLCs. The PLLCs had contracts with various hospitals to provide anesthesia services and related patient care. Dr. Hopkins was the sole owner of the PLLCs. He was also a practicing anesthesiologist, who provided clinical services in furtherance of the PLLCs' contracts.

¶ 5      Pursuant to the August 1, 2020, and May 1, 2022, medical director agreements entered into between Dr. Hopkins and 360 MSO, Dr. Hopkins served as medical director of 360 MSO and the PLLCs. Section 6(b) of the May 2022 agreement set forth the termination provisions, which provided, in part, that the agreement could be terminated by 360 MSO for any reason immediately upon written notice to the medical director (Dr. Hopkins). Section 6(c) provided for automatic termination in the event that Dr. Hopkins ceased to be an equityholder of the associated practices (the medical entities that had entered into management services agreements with 360 MSO).

¶ 6      On December 9, 2024, Dr. Hopkins, Grasso, and White, the initial members and managers of 360 MSO, signed a second amended limited liability agreement (360 health agreement) for 360

2

MSO, which contained various provisions for the governance of 360 MSO. Specifically, section 6.1(b) provided that each designated member had the right, by a unanimous vote of the other members, to remove and replace the appointed manager for cause. Section 2.1 defined "cause" as a good faith finding by the board and a "Unanimous in Interest," excluding the member or manager at issue, that the member or manager had engaged in conduct that fell within any of the enumerated categories in that section, some of which required notification of a breach and an opportunity to cure. Also, section 9.10(b) provided that the employment of Dr. Hopkins, White, or Grasso could not be terminated without cause unless all three members, including the one whose employment was subject to termination, agreed to the termination. Further, regarding the management of 360 MSO, section 6.2(b)(2) prohibited any of 360 MSO's managers from entering into any "contract, purchase order, debt obligation or other agreement under which [360 MSO's] obligations equal or exceed $50,000" without prior authorization or written consent of the requisite number of members. Section 6.4(b) allowed for 360 MSO's members to engage in other business ventures, as long as those ventures were "not in competition with" 360 MSO's business.

¶ 7    On February 2, 2026, based on allegations that Dr. Hopkins had engaged in conduct that was contrary to 360 MSO's business interests and the parties' agreements, Grasso and White removed Dr. Hopkins as manager. Specifically, Grasso and White, acting as designated members of 360 MSO, issued a document titled "Actions by Unanimous In Interest," which stated that it had been determined, in good faith, that Dr. Hopkins had violated the terms of 360 MSO's health agreement by (1) usurping a business opportunity 360 MSO could have taken and refusing to bring that opportunity to 360 MSO, (2) refusing to participate in the mandatory dispute resolution procedure, (3) unilaterally agreeing to provide anesthesia services to certain hospitals, (4) unilaterally offering existing employees of 360 Anesthesia job opportunities at other hospitals

3

with compensation exceeding the $49,999 limit of authority to unilaterally bind 360 MSO to a contractual obligation, and (5) unilaterally increasing his medical director fees.

¶ 8    As the sole remaining managers and members, Grasso and White then determined that Dr. Hopkins would no longer receive his guaranteed payments under his agreement with 360 MSO and also terminated the medical director agreements. In addition, Grasso and White determined that under the terms of the securities transfer restriction agreement (STRA) in place among the parties and the PLLCs, Dr. Hopkins's interests in the PLLCs transferred out of his possession. Further, Grasso and White also determined that since Dr. Hopkins was terminated for cause, his interest in 360 MSO automatically converted to a non-voting interest. According to Dr. Hopkins, these actions were taken without his knowledge and without a meeting of the 360 MSO members.

¶ 9    Following Dr. Hopkins's removal, on February 4, 2026, 360 MSO filed a three-count complaint against Dr. Hopkins, alleging breach of fiduciary duty, violation of the Delaware Trade Secrets Act (6 Del. Code § 2001 *et seq.*), and breach of contract. The complaint alleged that Dr. Hopkins breached his fiduciary duty of loyalty, duty to avoid self-dealing, and duty of good faith and fair dealing. Specifically, the complaint alleged that in 2025, Dr. Hopkins incorporated Catalyst Pain Institute PLLC (Catalyst) to obtain medical service contracts that could have been provided to 360 Anesthesia. The complaint alleged that Catalyst, through Dr. Hopkins, entered into a pain management services contract with a hospital, despite 360 Anesthesia having an expectation of entering into that same or similar contract. The complaint also alleged that Dr. Hopkins unilaterally increased his hourly fee for medical services that he provided as an independent contractor for 360 Anesthesia, and during a January 28, 2026, meeting, unilaterally offered existing staff of 360 Anesthesia job opportunities at a different hospital.

¶ 10    As for the claim relating to the Delaware Trade Secrets Act, the complaint alleged that Dr. Hopkins, in usurping the pain management services contract, used his knowledge of 360 MSO's confidential and propriety information, as well as its trade secrets. Regarding the breach of contract count, the complaint alleged that Dr. Hopkins breached the 360 health agreement by unilaterally offering the existing health care service providers job opportunities with compensation packages exceeding $49,999. The complaint also alleged that Dr. Hopkins breached the 360 health agreement by using Catalyst to usurp the proposed pain management services contract and by refusing to present Catalyst as a business opportunity to 360 MSO.

¶ 11    On February 4, 2026, 360 MSO filed a motion for TRO, making similar allegations to those raised in its complaint. However, the motion also alleged that after Dr. Hopkins's removal as manager and medical director, and after his counsel was provided with the filed complaint, Dr. Hopkins held another meeting with health care service providers encouraging them to leave their medical facility and provide services at another facility in an effort to benefit his solely owned and operated entity. The motion requested an injunction preventing Dr. Hopkins from contacting, soliciting, or otherwise communicating with 360 MSO, the PLLCs, and the associated health care providers; and from utilizing 360 MSO's trade secrets and confidential and propriety information.

¶ 12    Thereafter, Dr. Hopkins filed his answer and affirmative defenses to the complaint, as well as counterclaims. He also filed a third-party complaint against 360 MSO, Grasso, and White, making individual claims, as well as derivative claims on behalf of the PLLCs. In the third-party complaint, Dr. Hopkins asserted breach of contracts claims, claims for conversion of equity, a breach of fiduciary duty claim, claims for intentional interference with contractual obligations, claims for intentional interference with business expectancy, a civil conspiracy claim, and a claim for violation of section 2701(a) of the Stored Wire and Electronic Communications and

5

Transactional Records Access Act (18 U.S.C. § 2701(a) (2018)). He also sought a permanent injunction and a declaratory judgment.

¶ 13　Dr. Hopkins alleged that under the 360 health agreement, the three member-managers of 360 MSO were required to unanimously agree on a majority of the decisions. He alleged that although the 360 health agreement permitted a member to be terminated "for cause," the finding of cause must be made in good faith. He also alleged that the 360 health agreement limited the circumstances where a member or manager may be terminated for cause, and the bases set forth for his termination did not conform to any of the identified categories. However, he alleged that even if the reasons for his termination were proper under the 360 health agreement, those bases fell within the enumerated categories requiring notice to cure before termination. He asserted that since he was not given the requisite notice, his termination was invalid.

¶ 14　Dr. Hopkins further alleged that he presented the business opportunity in question to Grasso and White, but they rejected it. Thus, he contended that he was within his rights to take the opportunity elsewhere. In addition, he asserted that 360 MSO's claims that he had failed to participate in the mandatory dispute resolution procedure outlined in the 360 health agreement and that he unilaterally retained a regional operations manager related to actions taken on behalf of 360 Anesthesia. He argued that the PLLCs were solely owned and managed by him, and under those companies' operating agreements, he had the sole discretion to make business decisions for those companies. He argued that 360 MSO did not have authority to make decisions for the PLLCs concerning any service contracts that they enter into or where the companies could conduct business. As such, he argued that he was fully within his rights, as sole member and manager of 360 Anesthesia, to agree to a contract on behalf of 360 Anesthesia to provide anesthesia services at a hospital using 360 Anesthesia employees. He also argued that the regional operations manager

6

that he hired was an employee retained by 360 Anesthesia, and the salary was paid by 360 Anesthesia. He noted that 360 MSO's control over the daily operations of 360 Anesthesia was limited to the direction of its own administrative personnel engaging in the contracted-for management services, and 360 MSO had no control over 360 Anesthesia's employees.

¶ 15    Based on the above, Dr. Hopkins argued that his termination was without cause, and 360 MSO's health agreement provided that a member could not be terminated without cause unless all members, including the member whose employment was subject to termination, agreed. He acknowledged that the medical director agreement permitted 360 MSO to terminate the agreement at any time but argued that the decision and process for removing a 360 MSO member was governed by the 360 health agreement.

¶ 16    In addition, Dr. Hopkins asserted that his removal as medical director and the purported transfer of his interests in the PLLCs had left the PLLCs without a qualified medical director and had severely jeopardized their contractual relationships and clinical practices. He asserted that Grasso and White removed his access to 360 MSO's systems, which included hospital contracts and his professional email; directed that he not speak to or contact any of the 360 MSO patients, customers, or corporate staff; and removed him from meeting invitations with hospital staff. He argued that these actions left the PLLCs without a qualified medical director and prevented him and the PLLCs from being able to provide needed medical services to patients. He also argued that he was necessary and indispensable to the management and daily operations of the PLLCs and cutting off his access to all databases and communication resources was a breach of 360 MSO's obligation to provide services to the PLLCs. He argued that the actions of Grasso and White had damaged the PLLCs by jeopardizing their ability to fulfil their contractual obligations to clients, undermining their relationships with clients and hospital partners, and causing a loss of current

and future profits and customer goodwill. Thus, he argued that these actions had subjected him, and the PLLCs, to potential liability for breach of contract and interfered with their business prospects. He also argued that Grasso and White, through 360 MSO, were no longer compensating him for medical services that he was still obligated to perform.

¶ 17    Dr. Hopkins acknowledged that he entered into the August 1, 2020, STRA with 360 MSO and G&G Anesthesia, which allowed for the automatic transfer of his equity securities upon the happening of a defined transfer event. However, he argued that as his termination as medical director was legally invalid, no transfer event had occurred, and any transfer was a breach of the STRA. Also, Dr. Hopkins asserted that the STRA required that his interests be transferred to a designated transferee, but Grasso and White had not identified a transferee, which likely meant that they had not designated a transferee that satisfied the criteria set forth in the STRA. Dr. Hopkins also asserted that there was no executed STRA between him and 360 MSO regarding 360 Anesthesia, so any purported transfer of 360 Anesthesia was wholly deficient. Thus, Dr. Hopkins argued that Grasso and White had no right to possess the equity securities of the PLLCs, and they had wrongfully assumed control over the companies.

¶ 18    Subsequently, Dr. Hopkins filed a motion for TRO and preliminary injunction, making similar arguments to those raised in the third-party complaint. Dr. Hopkins sought the entry of a TRO and preliminary injunction to maintain the status quo prior to the actions on February 2, 2026. He again argued that he did not usurp a business opportunity from 360 MSO, explaining that after Grasso and White rejected the opportunity, he gave them notice that he would separately pursue it but was willing to fold it into the 360 MSO system if they changed their minds. Dr. Hopkins also alleged that under his medical director agreements, he was paid medical director's fees based on the fair market value of the provided services. He also noted that he performed clinical services as

8

an anesthesiologist, and in January 2026, he raised the hourly rate that he charged for those services to reflect the current fair market value. He alleged that he told Grasso and White of the increase in his hourly rate, and they did not object at the time. He noted it was common business practice for 360 MSO and the PLLCs to hire employees to fill immediate needs without full discussion or unanimous consent. Also, as the sole member and manager of 360 Anesthesia, he noted that clinical staffing concerns were within his control.

¶ 19 Dr. Hopkins argued that the actions taken on February 2 were taken without regard to patient care and services. He noted that as the owner of the PLLCs, he was the sole contact for all contracted hospitals, many of which were critical access hospitals. He noted that he had received calls from the hospitals and clinics because they had not been offered replacements for their scheduled anesthesiologist. He also noted that communication was sent to the staff of 360 MSO and the PLLCs informing them that he was no longer a managing partner, but the email did not identify the licensed physician who had replaced him. Although Grasso had communicated to the hospitals that Grasso was the point of contact, Dr. Hopkins noted that Grasso was not an anesthesiologist or medical doctor and did not have the qualifications to fulfill the medical director role. Dr. Hopkins asserted that on February 6, 2026, Grasso and White sent him a cease and desist letter, demanding that he not take any further action on behalf of 360 MSO and the PLLCs. However, Dr. Hopkins asserted that abiding by the cease and desist letter prevented him from ensuring that the contractual obligations with the various hospitals, and the patients' needs, were being met.

¶ 20 Also, Dr. Hopkins alleged that because of the actions of Grasso and White, he suffered irreparable harm to his standing with the hospitals, providers, and healthcare institutions and also a threat to his medical license. Dr. Hopkins alleged that Grasso and White had made disparaging

9

and untrue comments about him to hospital executives and to clinical and corporate staff. He asserted that he had served as point of contact on four pending contracts with new hospitals, and it was reasonably foreseeable that, without his presence, those opportunities would be lost. He also asserted that he had heard that Grasso and White intended to increase the cost on one hospital contract, which would likely lead to cancellation, and that they intended to terminate another contract. He further asserted that his removal from the scheduling software used by the clinical sites had caused confusion and a breakdown in communication. He alleged that Grasso and White had attempted to delay him obtaining, or had attempted to remove, his credentials with the contracted hospitals.

¶ 21    Dr. Hopkins alleged that he had a protectable interest because although he was terminated as a 360 MSO manager, he still owned 40% of the company, he had made capital contributions to the company, and he had invested countless hours in the business. He also alleged that, as the sole member of the PLLCs, he had a protectable interest in his ownership. He further alleged that he had a protectable interest in maintaining his license, maintaining his credentials, and maintaining the standard of care and ethical conduct required of his profession.

¶ 22    Dr. Hopkins argued that a remedy at law was inadequate to counter the risk to the patients' health and safety, to his reputation, to the contracts that would be lost, and to the relationships that would be destroyed. He further argued that he was likely to succeed on the merits because the actions taken by White and Grasso failed to follow the agreements that governed the relationship of the entities and their members. Thus, Dr. Hopkins requested the trial court enter a TRO to maintain the status quo as it existed on February 2, 2026, before he was removed as a manager. Attached to the motion was his February 15, 2026, affidavit, which verified the factual allegations contained in his motion.

10

¶ 23    Thereafter, 360 MSO filed a memorandum of law in support of its motion for TRO, which included February 18, 2026, affidavits from White and Grasso, setting forth their version of events upon which 360 MSO's allegations were based.

¶ 24    During the February 19, 2026, hearing on the parties' motions for TROs, the trial court and the parties' counsel discussed whether February 2, 2026, should be the date used for preservation of the status quo. Noting that the status quo was the last peaceable status, 360 MSO's counsel argued that the status quo was prior to July 2025, as that was before Dr. Hopkins had breached his fiduciary duties and began acting in a manner that was inconsistent with company policies. Counsel acknowledged that Dr. Hopkins was a 360 MSO manager at that time but argued that the trial court could take necessary actions to prevent him from dissipating 360 MSO's property. However, counsel argued that the alternative position was that the status quo was on February 2 after Dr. Hopkins had received notice that he was removed as manager but had not taken any responsive action. Counsel then argued that an injunction was necessary to protect 360 MSO's business assets and that there was no risk to the public health and safety, or to an effective administration, as there were managers and new medical directors already in place. Counsel noted that two anesthesiologists had signed agreements to serve as medical directors for the PLLCs. Counsel also argued that if the trial court reinstated Dr. Hopkins, that would be extraordinary relief that would be difficult to manage. Counsel further argued that Dr. Hopkins had failed to establish the necessary requirements for the trial court to grant Dr. Hopkins's request for a TRO.

¶ 25    In response, Dr. Hopkins's counsel argued that Dr. Hopkins was receiving ongoing phone calls from hospitals, medical directors, and doctors, as they were extremely confused by increased contract rates, shifts not being covered, and their point of contact being White and Grasso, neither of whom were medical doctors. Counsel argued that the status quo was before Dr. Hopkins was

11

removed as manager and that the trial court should return the parties to that status quo and allow the companies to continue to operate. Counsel indicated that if necessary, counsel would agree to the appointment of a receiver during the pendency of the case.

¶ 26 Dr. Hopkins's counsel noted that 360 MSO did not have medical directors in place for the PLLCs until very recently and that Grasso and White removed Dr. Hopkins as manager and medical director without any plan in place. Counsel argued that Dr. Hopkins would suffer irreparable harm because he was subject to having his credentials removed at various hospitals, and his reputation and business relationships were being destroyed. Counsel further argued that that there was a likelihood of success on the merits, as the "for cause" allegations were not "sufficient as for cause allegations." Thus, counsel requested that the trial court issue a TRO allowing Dr. Hopkins to resume his duties as manager and continue as medical director.

¶ 27 360 MSO's counsel then argued that Grasso and White had good cause to remove Dr. Hopkins based on his willful misconduct, breach of company policy, and breach of his duty of loyalty. Counsel argued that the trial court should consider the affidavits that were filed, which showed that Dr. Hopkins interfered with existing contracts, met with various hospital executives, failed to mediate as required, and breached his fiduciary duties.

¶ 28 After hearing counsels' arguments, the trial court orally announced its decision to deny 360 MSO's request for a TRO, but that it would grant Dr. Hopkins's motion for a TRO, restoring the parties to the status quo before February 2, 2026. The trial court found that Dr. Hopkins had met all of the necessary elements for the entry of a TRO. Specifically regarding the likelihood of success on the merits, the trial court noted that because the merits were "factually disputed, heavily," the trial court had selected the status quo prior to February 2. However, the trial court noted that Dr. Hopkins was prohibited from using confidential information pursuant to his

12

agreement with 360 MSO, he was prohibited from violating any terms of the agreement, and he was prohibited from attempting to solicit or change any client or employer relationship. The trial court noted that Dr. Hopkins was required to abide by the agreement's terms as it existed prior to February 2, 2026.

¶ 29 Thereafter, Dr. Hopkins filed an amended verified answer, affirmative defenses, counterclaim, and third-party complaint, which contained the same allegations as the initial filing but included his February 19, 2026, verification of the pleadings (the initial filing was not verified).

¶ 30 On February 20, 2026, the trial court entered a written order reiterating its oral findings. In particular, the trial court granted Dr. Hopkins's motion for TRO, finding that Dr. Hopkins had demonstrated, through the pleadings, affidavits, and exhibits on file and through counsel's arguments, that he had a protectable interest at stake, that he would suffer irreparable harm without a TRO, that he had no adequate remedy at law for such harm, and that he had a reasonable likelihood of success on the merits. The trial court acknowledged that the matters were disputed by 360 MSO, but for purposes of granting Dr. Hopkins's motion, the trial court found that Dr. Hopkins had sufficiently pled and proven the necessary elements for the entry of a TRO.

¶ 31 Thus, the trial court entered an order to return the parties to the status quo as it existed prior to February 2, 2026. Specifically, the trial court (1) reinstated Dr. Hopkins as manager and all other positions held within 360 MSO; (2) reinstated Dr. Hopkins's guaranteed payment as manager and any payments withheld by 360 MSO since February 2, 2026; (3) reinstated Dr. Hopkins's voting rights in 360 MSO; (4) reinstated Dr. Hopkins as medical director under the medical director agreements between Dr. Hopkins and 360 MSO; (5) ordered 360 MSO to remit any payments owed for clinical services performed by Dr. Hopkins since February 2, 2026, as medical director of 360 MSO and the PLLCs; (6) restored Dr. Hopkins's ownership and management

13

interests in the PLLCs; (7) enjoined any transfer or encumbrance of ownership interests in the PLLCs during the duration of this order, except as necessary to restore Dr. Hopkins to his prior position; (8) restored Dr. Hopkins's access to his own email address and the software systems used by 360 MSO and the PLLCs; (9) enjoined 360 MSO, Grasso, and White, and anyone acting in concert with them, from manipulating, obstructing, or otherwise interfering with Dr. Hopkins's access to his own email and any data held on the software systems; (10) reinstated Dr. Hopkins as medical director of 360 MSO; (11) enjoined 360 MSO, Grasso, and White, and anyone acting in concert with them, from obstructing Dr. Hopkins's ability to provide medical services to patients and from fulfilling 360 MSO's and its affiliates' contractual obligations; (12) enjoined 360 MSO, Grasso, and White, and anyone acting in concert with them, from disparaging Dr. Hopkins to any employee, independent contractor, or contractual partner of 360 MSO and the PLLCs; and (13) enjoined Dr. Hopkins from using 360 MSO's confidential information in a way contrary to 360 MSO's interests and from disparaging 360 MSO to any employee, independent contractor, or contractual partner of 360 MSO and/or the PLLCs.

¶ 32    On February 23, 2026, 360 Health MSO, Grasso, and White (the appellants) filed a joint petition for interlocutory appeal, pursuant to Illinois Supreme Court Rule 307(d) (eff. Nov. 1, 2017). In the petition, the appellants noted that they were appealing the trial court's decision granting Dr. Hopkins's motion for TRO, and associated relief, and sought reversal of that order.

¶ 33                                    II. ANALYSIS

¶ 34    On appeal, the appellants argue as follows: (1) Dr. Hopkins did not have a valid, operative pleading before the trial court, as his answer, counterclaim, and third-party complaint were unverified; (2) the trial court improperly decided the case on its merits; (3) the trial court did not maintain the status quo; (4) the relief granted by the trial court did not balance the hardships; and

14

(5) the trial court erred in granting Dr. Hopkins's motion for TRO because Dr. Hopkins did not establish sufficient facts to support the trial court's extraordinary intervention with the parties' contractual and employment relationships, Dr. Hopkins did not establish a reasonable likelihood of success on the merits, and a balance of the hardships weighed in favor of denying the TRO.

¶ 35    The appellants first contend that the trial court erred in granting the TRO because Dr. Hopkins's answer, counterclaim, and third-party complaint were unverified. The appellants argue that the unverified pleading was invalid under section 2-605(a) of the Code of Civil Procedure (Code) (735 ILCS 5/2-605(a) (West 2024)) and thus was insufficient to support Dr. Hopkins's motion for TRO. However, the appellants acknowledge that Dr. Hopkins subsequently amended his pleading to include a verification. The appellants also argue that Dr. Hopkins's affidavit attached to his TRO motion did not confirm the accuracy of his answer and counterclaim, as it merely authenticated attached exhibits and set forth certain facts and conclusions. The appellants assert that, at a minimum, it was improper for the trial court to rely on unverified denials and allegations, which were not included in Dr. Hopkins's affidavit. The appellants further argue that even though the injunctive relief claim asserted in the third-party complaint was not directed at 360 MSO, 360 MSO was subject to the issued TRO.

¶ 36    During the TRO hearing, 360 MSO's counsel argued that Dr. Hopkins's request for a TRO should be denied because Dr. Hopkins did not file a verified answer or counterclaim. Dr. Hopkins's counsel then indicated that he would file an amended, verified answer, and the trial court responded, "Okay. Thank you." Counsel then subsequently filed the amended, verified answer, counterclaim, and third-party complaint. The decision to grant a party leave to amend a pleading rests within the sound discretion of the trial court. *Hayes Mechanical, Inc. v. First Industrial, L.P.*, 351 Ill. App. 3d 1, 7 (2004). The appellants here have presented no argument that the trial court

15

abused its discretion when it permitted Dr. Hopkins to amend his pleading to include a verification. In addition, we note that section 11-101 of the Code (735 ILCS 5/11-101 (West 2024)), which governs the filing of TROs, contains no requirement that the pleading on which the TRO with notice is granted must be verified. Moreover, section 11-102 of the Code (*id.* § 11-102), which governs preliminary injunctions, also contains no requirement that the pleadings on which a preliminary injunction is based must be verified. See *Roxana Community Unit School District No. 1 v. WRB Refining, LP*, 2012 IL App (4th) 120331, ¶ 19 (verification is not required if the defendant receives notice as mandated by section 11-102 of the preliminary-injunction statute). Also, when Dr. Hopkins filed his TRO motion against 360 MSO, Grasso, and White, he properly included his affidavit verifying the factual allegations in the motion. Thus, we find that the appellants' contentions directed at the sufficiency of Dr. Hopkins's filings have no merit.

¶ 37    The appellants next contend that the trial court improperly decided this case on the merits. In making this argument, the appellants point to language in a proposed draft TRO order. Specifically, this proposed written order indicated that the trial court found that the appellants' actions on February 2 were "void and invalid." However, this language was not included in the written order that was ultimately filed. Thus, we also find that this contention has no merit.

¶ 38    The appellants' remaining arguments address the specific requirements for the issuance of a TRO. Initially, the parties disagree as to the appropriate standard of review. The appellants recognize that, in general, an order granting or denying a TRO is a matter within the trial court's discretion and is reviewed for an abuse of discretion. See *Abbinanti v. Presence Central & Suburban Hospitals Network*, 2021 IL App (2d) 210763, ¶ 15. However, the appellants contend that we should apply the *de novo* standard of review because the trial court did not make any factual findings in its decision, and the trial court's ruling interprets the terms and processes of the

16

various contracts entered into between the parties. In support, the appellants cite *Hutsonville Community Unit School District No. 1 v. Illinois High School Ass'n*, 2021 IL App (5th) 210308, ¶ 7, in which this court held that the standard of review was *de novo* because the trial court did not provide any factual findings in its order denying the TRO. In that case, the trial court entered an order through a docket entry, which merely stated that the arguments were made, and the trial court denied the motion for TRO. *Id.*

¶ 39    In response, Dr. Hopkins argues that we should apply an abuse of discretion standard of review. He acknowledges that the parties' agreements were the "guideposts to their rights and relationships" but contends that the trial court was required to determine the parties' rights under the various agreements and whether the factual circumstances justified the appellants' actions or merited the entry of a TRO. Thus, Dr. Hopkins contends that the question presented was a mixed question of law and fact. In support, he cites *Guns Save Life, Inc. v. Raoul*, 2019 IL App (4th) 190334, ¶ 40, which held that when a case presented mixed issues of both law and fact, the trial court's decision will not be overturned absent a clear showing of abuse of discretion.

¶ 40    Here, in its order granting Dr. Hopkins's motion for TRO, the trial court found that Dr. Hopkins, through the pleadings, affidavits, and exhibits on file, as well as through counsel's arguments, had demonstrated the necessary TRO requirements. The trial court acknowledged that these matters were disputed by 360 MSO, but for purposes of granting the TRO, the trial court found that Dr. Hopkins had sufficiently pled and proven the necessary elements for obtaining a TRO. In reaching this decision, the trial court would have had to make necessary factual determinations based on the pleadings and other documents on file. Thus, even though the trial court's order did not set forth its factual findings, the questions presented here are not pure questions of law. Accordingly, we find that *de novo* is not the appropriate standard of review.

¶ 41    Therefore, regardless of whether the issues presented in this case are mixed questions of law and fact as argued by Dr. Hopkins, the appropriate standard of review for the trial court's decision to grant Dr. Hopkins's TRO is abuse of discretion. See *Guns Save Life, Inc.*, 2019 IL App (4th) 190334, ¶ 40; *Cook County v. Rosen & Shane Wine & Spirits, Inc.*, 58 Ill. App. 3d 744, 749 (1978); *Abbinanti*, 2021 IL App (2d) 210763, ¶ 15. A trial court abuses its discretion only when its decision is arbitrary, fanciful, or unreasonable, or when no reasonable person would adopt the trial court's view. *Guns Save Life, Inc.*, 2019 IL App (4th) 190334, ¶ 39.

¶ 42    A TRO is an extraordinary remedy that is issued to maintain the status quo until the case is disposed of on the merits. *Bradford v. Wynstone Property Owners' Ass'n*, 355 Ill. App. 3d 736, 739 (2005). To obtain a TRO, a party must show (1) a clearly ascertained right requiring protection, (2) irreparable injury in the absence of injunctive relief, (3) no adequate remedy at law, and (4) a likelihood of success on the merits of the underlying claim. *Id.* "If these elements are met, then the trial court must balance the hardships and consider the public interests involved." *Makindu v. Illinois High School Ass'n*, 2015 IL App (2d) 141201, ¶ 31. The party seeking the TRO need not make out the entire case; rather, the party only needs to demonstrate the existence of a fair question on the elements and persuade the trial court to preserve the status quo. *McHenry County Sheriff v. McHenry County Department of Health*, 2020 IL App (2d) 200339, ¶ 27.

¶ 43    Here, the appellants argue that in granting Dr. Hopkins's TRO, the trial court acted as a "super-personnel department" by reexamining and second-guessing an employment decision that was within the appellants' business discretion. In support, the appellants cite *Zannis v. Lake Shore Radiologists, Ltd.*, 73 Ill. App. 3d 901, 904 (1979), in which the First District stated that it was well settled that, with respect to personal service contracts, a trial court should not compel an employee to work for his employer, nor compel an employer to retain an employee. In that case, a

18

physician employee of a professional corporation sought an order compelling reinstatement to his clinical job after his contract was terminated. *Id.* However, the appellate court concluded that an order compelling reinstatement should not be issued under those circumstances because it would amount to specific performance of a personal services employment relationship; it would force unwilling physicians to practice together; and it would require courts to supervise services that require special skill, knowledge, judgment, and/or discretion. *Id.* at 904-05.

¶ 44    Relying on this decision, the appellants here argue that Dr. Hopkins sought the same specific performance as the plaintiff in *Zannis*, reinstatement to his positions as manager and medical director. The appellants note that the medical director position requires Dr. Hopkins to perform services requiring special skill, knowledge, judgment, and/or discretion. Also, the appellants note that, as medical director overseeing patient care and serving as the contact between 360 MSO and its affiliated hospitals and clinics, the relationship between Dr. Hopkins and the appellants requires significant cooperation and trust.

¶ 45    In response, Dr. Hopkins argues that *Zannis* is distinguishable because it arose in a fundamentally different setting. He argues that this case concerns governance rights of a limited liability company, not employment, as 360 MSO does not employ clinicians. Dr. Hopkins notes that he is a member and manager of 360 MSO, not an employee of it, and any clinical work performed by him is through separate companies that are not parties to the case. In addition, Dr. Hopkins argues that the concern in *Zannis* about forced clinical cooperation and ongoing oversight does not exist here, as Grasso and White are not physicians and are not involved with the management of the medical practices. Thus, Dr. Hopkins argues that the TRO merely restored him to those roles.

19

¶ 46 After considering the above arguments and reviewing the record, we agree with Dr. Hopkins that this case is distinguishable from *Zannis* in that it does not involve a personal services employment contract that would require the court to supervise professional services requiring special skill, knowledge, judgment, and/or discretion. 360 MSO is a limited liability company, and Dr. Hopkins was a manager of that company, not an employee. The issue presented here concerns whether he should be reinstated as a manager of that company, not whether an employer should be forced to retain an employee. Also, any clinical work completed by Dr. Hopkins is not through 360 MSO. Thus, we conclude that the TRO entered in this case did not amount to specific performance of a personal services employment contract. Moreover, as noted by Dr. Hopkins, if there is any ongoing friction, that can be addressed through conventional LLC governance tools or by appointing a receiver.

¶ 47 The appellants next contend that Dr. Hopkins failed to establish a likelihood of success on the merits.[1] Specifically, the appellants argue that both parties submitted affidavits in support of their positions, and the affidavits included conflicting allegations. However, the appellants argue that the various affidavits did not differ with respect to the undeniable conflict and lack of trust that exists between Dr. Hopkins, Grasso, and White. The appellants contend that despite this conflict, Dr. Hopkins was returned to a position requiring the appellants' trust, confidence, and cooperation. In addition, the appellants argue that their affidavits differed from Dr. Hopkins's affidavits in that the affidavits from Grasso and White stated facts and attached supporting exhibits, while Dr. Hopkins's affidavit contained conclusions, inadmissible hearsay, and statements made on information and belief that could not be considered.

---

[1]The appellants do not raise any arguments on the remaining three TRO elements, so we will not address them in this decision.

20

¶ 48 In reply, Dr. Hopkins argues that he had established a likelihood of success on the merits. Specifically, he notes that the 360 health agreement limits the circumstances under which a member or manager may be terminated for cause. Dr. Hopkins argues that the actions by unanimous interest issued by Grasso and White did not articulate any reasons that conformed with any of the categories enumerated in the 360 health agreement. Also, Dr. Hopkins argues that the 360 health agreement required that he be provided with notice to cure before termination, but no notice was provided. Thus, he argues that he established sufficient facts to support the conclusion that his termination was invalid. Moreover, he argues that the remainder of the February 2 actions were predicated on the improper "for cause" termination.

¶ 49 To establish a likelihood of success on the merits, the party only needs to raise a fair question as to the existence of a claimed right and a fair question that he will be entitled to the relief prayed for if the proof supports the allegations. *Kalbfleisch v. Columbia Community Unit School District Unit No. 4*, 396 Ill. App. 3d 1105, 1114 (2009). Here, based on the pleadings on file, which included the conflicting affidavits and filed exhibits, the trial court found that Dr. Hopkins had established a likelihood of success on the merits. After carefully reviewing the record, we do not find that the trial court's decision was arbitrary, fanciful, or unreasonable, or that no reasonable person would have adopted the trial court's view. In issuing the TRO, the trial court considered the conflicting information provided in the affidavits and the various other filings and weighed the credibility of the presented information. The trial court is in the best position to resolve the conflicts in the evidence, which includes determining the credibility of the affidavits presented by the parties. See *County of Du Page v. Gavrilos*, 359 Ill. App. 3d 629, 636 (2005) ("Although there is no Illinois case specifically addressing the trial court's ability to assess conflicting affidavits in support of injunctive motions, we see no reason why the trial court should not be in

21

the best position to judge the credibility of the affidavits filed in support of the application for a preliminary injunction, as it is the trial court's province to resolve any conflicts."). Further, we presume that the trial court disregarded any inadmissible evidence in issuing the TRO. See *In re Z.J.*, 2020 IL App (2d) 190824, ¶ 85. Thus, we conclude that the trial court's decision was not an abuse of discretion.

¶ 50 The appellants also contend that the trial court failed to balance the hardships. We acknowledge that the trial court did not mention, in either its oral ruling or written order, that it had balanced the hardships. However, there was no indication in the supporting record that the trial court did not do so. Absent evidence to the contrary, it is presumed that the trial court's order was in conformity with the law and had a sufficient factual basis. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 392 (1984). Thus, we find that the appellants' contention that the trial court did not balance the hardships is meritless.

¶ 51 Alternatively, the appellants argue that balancing the hardships weighs against Dr. Hopkins's reinstatement. When balancing the equities, the trial court must weigh the benefits of granting the injunction against the possible injury to the opposing party. *Makindu*, 2015 IL App (2d) 141201, ¶ 47. The appellants argue that the balance of hardships strongly favors denial of the TRO because, by ordering Dr. Hopkins's reinstatement, the trial court subjected the appellants to immediate and irreparable harm resulting from Dr. Hopkins's continued misconduct. The appellants argue that Dr. Hopkins, through Catalyst, was already directly competing with 360 MSO, and his actions had eroded the appellants' market position, goodwill, and reputations. The appellants further argue that the trial court improperly injected itself into an employment dispute, reversed a legitimate business action that was within the appellants' discretion, and forced hostile parties into a relationship of trust and confidence. Also, the appellants contend that the trial court's

22

order authorized and/or permitted Dr. Hopkins's continued efforts to exploit the appellants' confidential and propriety information for his own benefit.

¶ 52    The appellants argue that reversal of the trial court's order will result in minimal hardship, as the order would merely follow longstanding legal principles and policy reasons for the rule against compelling an employer to retain an employee. Also, the appellants argue that Dr. Hopkins should not be concerned about his medical license, as new medical directors have been hired.

¶ 53    Dr. Hopkins argues that the appellants' contentions are based on disputed facts, which were considered by the trial court when it entered the TRO. Also, Dr. Hopkins argues that the trial court's order evidences that the trial court did consider the rights and interests of all parties.

¶ 54    Again, we note that the trial court, which is in the best position to determine the credibility of the submitted affidavits, evaluated the information presented in the conflicting affidavits and other filings, and determined that Dr. Hopkins had sufficiently proven the necessary requirements for a TRO. Also, in entering the TRO, the trial court specifically enjoined Dr. Hopkins from using 360 MSO's confidential information in a way that was contrary to 360 MSO's interests and also enjoined Dr. Hopkins from disparaging 360 MSO to any employee, independent contractor, or contractual partner of 360 MSO and the PLLCs. The trial court also noted that Dr. Hopkins was required to abide by the terms of the 360 health agreement as it existed prior to February 2, 2026. Thus, we agree with Dr. Hopkins's contention that when the trial court issued the TRO, it considered the rights and interests of all parties.

¶ 55    Lastly, the appellants argue that the trial court did not maintain the status quo. In issuing the TRO, the trial court determined that the status quo was prior to February 2, 2026, before Grasso and White removed Dr. Hopkins as the manager and medical director of 360 MSO and as medical director of the PLLCs. The appellants argue that, in choosing this date, the trial court did not

maintain the status quo and effectively placed the parties directly back into the midst "of a relationship rife with turmoil, in-fighting, and instability." The appellants argue that the proper status quo was the period of time following the February 2 actions that preceded the current, pending controversy. The appellants argue that Dr. Hopkins's removal from any position where he could continue to act in a manner where he could utilize the appellants' resources and goodwill to further usurp business opportunities was the condition necessary to prevent continued harm.

¶ 56    In response, Dr. Hopkins contends that White and Grasso acted to oust him as manager and medical director of 360 MSO and as owner of the PLLCs and that the "lawfulness of this removal" was the crux of this litigation. Thus, Dr. Hopkins argues that it was necessary to restore the parties' rights and status to before February 2 to maintain the status quo to preserve the rights, relationships, and assets of the parties, their customers, and the patients.

¶ 57    The status quo is defined as the least peaceable uncontested status that preceded the pending controversy. *Steel City Bank v. Village of Orland Hills*, 224 Ill. App. 3d 412, 417 (1991). The status quo has also been interpreted as the condition necessary to prevent dissipation or destruction of the property in question. *Kalbfleisch*, 396 Ill. App. 3d at 1118. Under either interpretation, an injunction is designed to prevent a threatened wrong or the further perpetration of an injurious act. *Id.*

¶ 58    Here, the underlying dispute in this litigation is whether the actions taken by Grasso and White on February 2 were in compliance with the 360 health agreement. Dr. Hopkins noted that from the companies' inception in approximately 2020 until February 2, 2026, the ownership and management of 360 MSO and the PLLCs remained the same. Dr. Hopkins also presented facts demonstrating that his removal on February 2 endangered the operations of 360 MSO and the PLLCs, their contractual relationships with affiliated hospitals and clinics, and the health and

24

safety of patients. He presented further facts showing that his removal placed him at risk of irreparable harm to his professional reputation and licenses. The trial court, considering the information presented by Dr. Hopkins, as well as the information presented by the appellants to support its position on the status quo, determined that the status quo that should be preserved was the status quo as it existed before February 2, 2026. Based on the above, we find that the trial court's decision was not arbitrary, fanciful, or unreasonable, or a position that no reasonable person would adopt. The trial court temporarily restored the parties to the position that they were in before Grasso and White removed Dr. Hopkins as manager and medical director in an effort to prevent any further damage to the businesses or their customer relationships due to the purported disruption in services and leadership. From our review of the supporting record, we find that the trial court's decision to issue the TRO was not an abuse of discretion.

¶ 59                                    III. CONCLUSION

¶ 60    For the above reasons, we affirm the order of the circuit court of Madison County. We direct the clerk to issue the mandate immediately.

¶ 61    Affirmed.

25